IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**WILMER MARTELL-RIVERA**,

    Plaintiff,

    v.

**COMMISSIONER OF SOCIAL SECURITY**,

    Defendant.

Civil No. 19-1545 (BJM)

## OPINION AND ORDER

Wilmer Martell-Rivera ("Martell") seeks review of the Commissioner's finding that he is not disabled and thus not entitled to disability benefits under the Social Security Act (the "Act"). 42 U.S.C. § 423. Martell contends the Commissioner's decision should be reversed because the administrative law judge ("ALJ")'s residual functional capacity ("RFC") finding and step five non-disability determination were not supported by substantial evidence. Docket Nos. 1, 16. The Commissioner opposed. Docket Nos. 13, 20. This case is before me on consent of the parties. Docket Nos. 1, 5-7. After careful review of the administrative record and the briefs on file, the Commissioner's decision is **affirmed**.

## STANDARD OF REVIEW

After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g). The court's review is limited to determining whether the Commissioner and his delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Secretary of Health & Human Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C. § 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Secretary of Health & Human Services*, 955 F.2d 765, 769 (1st Cir. 1991). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Visiting Nurse Association Gregoria Auffant, Inc. v. Thompson*, 447 F.3d 68, 72 (1st Cir. 2006) (*quoting Richardson v. Perales*, 402 U.S. 389, 401

(1971)). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Secretary of Health & Human Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

Generally, the Commissioner must employ a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Goodermote v. Secretary of Health & Human Services*, 690 F.2d 5, 6–7 (1st Cir. 1982). In step one, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At step three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1, which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, he is conclusively presumed to be disabled. If not, the evaluation proceeds to the fourth step, through which the ALJ assesses the claimant's RFC and determines whether the impairments prevent the claimant from doing the work he has performed in the past. An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). If the claimant is able to perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e). If he cannot perform this work, the fifth and final step asks whether the claimant is able to perform other work available in the national

economy in view of his RFC, as well as age, education, and work experience. If the claimant cannot, then he is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At steps one through four, the claimant has the burden of proving he cannot return to his former employment because of the alleged disability. *Santiago v. Secretary of Health & Human Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has done this, the Commissioner has the burden under step five to prove the existence of other jobs in the national economy the claimant can perform. *Ortiz v. Secretary of Health & Human Services*, 890 F.2d 520, 524 (1st Cir. 1989). Additionally, to be eligible for disability benefits, the claimant must demonstrate that his disability existed prior to the expiration of his insured status, or his date last insured. *Cruz Rivera v. Secretary of Health & Human Services*, 818 F.2d 96, 97 (1st Cir. 1986).

## BACKGROUND

The following is a summary of the treatment record, consultative opinions, and self-reported symptoms and limitations as contained in the Social Security transcript.

Martell was born on March 7, 1967, completed high school, is not fluent in English but is so in Spanish, and worked forklifting and manually distributing merchandise at a warehouse, and in building maintenance, painting and repair. On October 3, 2013, Martell applied for disability insurance benefits, claiming to have been disabled since November 17, 2012 (alleged onset date) at 45 years of age[1] due to depression and anxiety, diabetes, high blood pressure and back spasms. He last met the insured status requirements on December 31, 2017 (date last insured). Social Security Transcript ("Tr.") 28, 54-57, 79-81, 87, 92, 222-225, 236, 239-241.

**Treatment History**

***Dr. Felix Cruz***

Dr. Cruz treated Martell between June 2010 and September 2013. Martell had diabetes and hypertension and was morbidly obese, and Dr. Cruz prescribed medications, diet, and exercise. Tr. 328-380.

July and November 2011 to May 2012 notes show that Martell also felt lower back pain. Tr. 335-336, 338, 340, 351, 372, 374, 376. A March 2012 lumbosacral spine x-ray revealed L5-S1

---

[1] Martell was considered to be a younger individual (Tr. 79), and "[i]f you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work." 20 C.F.R. 404.1563(c).

Martell v. Commissioner of Social Security, Civil No. 19-1545 (BJM)                                    4

discogenic disease and degenerative spondylosis. Tr. 370. Martell was diagnosed in April 2012 with spondylosis L5-S1. Tr. 371.

Martell also felt right shoulder pain in November 2011 and July 2013, and left shoulder pain in June 2013. Tr. 376-380. A September 2013 right shoulder x-ray revealed suspected calcific tendinosis and degenerative changes in the acromioclavicular joint. Tr. 327. A right shoulder MRI scan dated December 2013 showed edema and focal full thickness tear of the supraspinatus tendon from the humeral attachment with degenerative changes of the acromioclavicular joint resulting in impingement. Tr. 382.

In January 2014, Martell underwent arthroscopic right shoulder surgery and was referred to rehabilitation therapy. Tr. 383-384, 541-558. The April 2014 physical therapy final report, in Spanish,[2] indicates that Martell's condition improved, and that Martell recuperated satisfactorily from the orthopedic surgery. With therapy, his articular mobility and function improved, and he no longer felt pain. Tr. 560.

### Dr. Rafael Machín

From March 2014 to February 2015, Martell sought post-operation treatment due to shoulder stiffness. His pain level was between one and three out of ten. Martell was able to walk. Neurological examination was normal. As to his musculoskeletal system, notes indicate no complaints of pain, and no edema in his extremities. Medications, diet, and exercise were prescribed to control Martell's cholesterol, diabetes, and high blood pressure. Martell was also referred to a podiatrist for a foot ulcer and shown how to take care of his feet. Tr. 561-610.

---

[2] This portion of Exhibit 16F is in the Spanish language and no English translation is available in the transcript received by the court. As per SSA's Program Operations Manual System ("POMS") DI 23045.001(1), "any foreign-language document used for a disability determination must have an English translation," with exception of "Spanish documents in cases processed by the Puerto Rico DDS or the Puerto Rico disability processing unit (DPU) do not have to be translated into English because all components that review or process cases adjudicated by that DDS or DPU have employees who can read and understand Spanish." However, Local Rule 5(c) of the United States District Court for the District of Puerto Rico provides that "[a]ll documents not in the English language which are presented or filed, whether as evidence or otherwise, must be accompanied a certified translation into English." Also, 48 U.S.C. § 864 provides that "[a]ll pleadings and proceedings in the United States District Court for the District of Puerto Rico shall be conducted in the English language." As such, "any submitted exhibit not directly translated into English or provided with a corresponding English translation may properly be disregarded by the district court." *Colón-Fontánez v. Municipality of San Juan*, 660 F.3d 17at 27 (1st Cir. 2011). I am considering this evidence in my review for substantial evidence because the ALJ makes reference to Exhibit 16F at page 9 of the decision. *See* Tr. 34.

A September 2014 lumbosacral spine x-ray revealed discogenic disease and degenerative spondylosis. Tr. 407. An October 2014 bilateral knee x-ray showed bony lesions in the left distal femur and left proximal tibia. Tr. 417. Various other exams were performed in February 2015. A lumbar spine CT scan revealed loss of the normal lordosis, most likely related to a spasm and moderate spondylosis, degenerative disc disease changes, posterior osteophyte disc complex at L5-S1 producing pressure effect upon the distal thecal sac, and smaller broad-based left paracentral disc protrusion at L4-L5. Tr. 611. A right knee MRI scan revealed that the medial meniscus showed irregularity at the posterior horn with evidence of an oblique tear and mild degenerative joint disease changes. Tr. 415, 612. A cervical spine x-ray showed discogenic disease and degenerative spondylosis. Tr. 613.

On June 9, 2015, Martell underwent right knee arthroscopy for a medial meniscus tear with orthopedic surgeon Dr. Norberto Báez. Tr. 411-412. Post-operation progress notes from June 23 indicate that Martell was doing well with minimal pain and minimal effusion, and good range of motion. Notes also indicate: "Patient with RT knee arthroscopy need's assistive Equipment 'Cane'." [sic]. Tr. 409. He was referred to physical therapy to increase range of motion and muscle strength. Tr. 408-409, 540.

May and June 2015 progress notes show a normal review of systems, some mild muscle pain, and mild anxiety and depression. Diagnoses at the time were degeneration of lumbosacral intervertebral disc, displacement of unspecified intervertebral disc without myelopathy, lumbago, hypertensive heart disease, Type II diabetes mellitus with neurological manifestations and peripheral circulatory disorders, and congestive heart failure. Medications were prescribed, along with diet and cardiovascular exercises. Tr. 614-617.

### Dr. Roberto Ayala Ríos

Dr. Ayala treated Martell from July 2015 to December 2016 with medications for diabetes, high blood pressure, mixed hyperlipidemia, discogenic disease with encroachment of nerve root, leg pain, edema, and status post right knee surgery. Tr. 513-516.

In January 2016, Martell complained of left shoulder pain. Tr. 512. A February 2016 left shoulder MRI scan revealed a complete tear of the supraspinatus tendon. Tr. 422. In October 2016, Martell underwent left shoulder surgery with orthopedic surgeon Dr. Manuel Benítez. Tr. 421, 494-495, 509-511. Dr. Ayala's November 2016 notes indicate that Martell was "feeling well." Martell was referred to rehabilitation therapy in December. Tr. 492-494.

Martell v. Commissioner of Social Security, Civil No. 19-1545 (BJM)                                        6

January 2017 physical therapy notes, also in Spanish,[3] indicate that after ten therapy sessions (Tr. 524-539), Martell's subjective degree of pain had diminished from intolerable to intense and that he walked safely without assistive equipment. More physical therapy was recommended. Tr. 520.

### *APS Clinics of Puerto Rico*

From December 2012 to November 2016, Martell was treated for major depressive disorder, recurrent, severe, with a Global Assessment of Functioning ("GAF") score of 60, in the moderate range. Tr. 35, 314-326, 423-491. The APS Clinics record (Exhs. 1F and 14F) is in the Spanish language, and no English translation is available in the transcript.[4]

The ALJ summarized this evidence as follows. In 2013 and 2014, Martell was anxious and depressed, but exam findings were normal. His concentration was adequate and memory, intact. Tr. 35. His GAF score in August 2013 was 65. Tr. 35, 315. From my review of the Spanish language record available, it is evident that starting December 2012 through 2014 Martell was alert, his thought process was logical, coherent, relevant and oriented. His affect, introspection and judgment were adequate. He was not suicidal or homicidal.  Tr. 315, 317, 319, 321, 325, 472-473, 476-477, 480-481, 484-485, 488, 490. Medications were prescribed and he was referred to psychotherapy. Tr. 316, 318, 324, 489, 491. Some improvement of his symptoms was noted (Tr. 318, 320, 322, 489, 491), except in August 2013 where "*No mejorando*" was check-marked. Tr. 316. 2014 notes indicate that his memory was intact and his concentration was adequate. Tr. 473, 481, 485, 477.

The ALJ further noted that symptoms fluctuated in 2015 and 2016 but continued within the moderate range. Tr. 35. "At times, the claimant's concentration was diminished and the undersigned accommodated for this by limiting him to routine, repetitive tasks." Tr. 35-36.  Notes from 2015 in general and October 2016 show that Martell was oriented in time, place, person, and situation. His memory (immediate, recent, and remote) was intact.  His concentration was adequate and his intellect was average. His thought process was logical, relevant, and coherent. His

---

[3] These notes also belong to Exhibit 16F, as mentioned at Footnote 2, and is directly mentioned by the ALJ at page 9 of the decision. Tr. 34.

[4] Exhibit 1F at Tr. 314-326 and Exh. 14F at Tr. 423-491 are in the Spanish language and no English translation is available in the transcript received by the court. Same as in Footnotes 2 and 3, the ALJ considered them in the decision, and I therefore am reviewing them as well in my review of substantial evidence.

Martell v. Commissioner of Social Security, Civil No. 19-1545 (BJM)                    7

judgment was good and his introspection was adequate. Tr. 431-432, 455-456, 460-461, 468-469. Notes from June 2015 and March, April and July 2016 show that he was oriented, but his memory was regular instead of intact, his concentration and introspection were diminished, and his judgment was regular instead of good. Tr. 439, 446, 451, 465. Notes from September 2015 have check-marked that Martell was improving (Tr. 459) in contrast to December 2015 notes, which have not improving check-marked. Tr. 454. The ALJ found that treatment was conservative in nature, and no hospitalization was required. Tr. 36. November 2016 notes indicate that the response to the pharmacological plan was good. Tr. 423.

**Procedural History**

Martell reported that his back spasms caused intense back and leg pain, and that the bones of his forearms were deteriorating. His conditions limited his ability to sleep, bathe and shave, use the toilet, get dressed, lift objects, drive, and handle money. He did not prepare meals or do house and yard work. He was forgetful and could not concentrate. His wife assisted him. He watched television and went to church but did not spend time with other people. Martell claimed being able to walk for five to ten minutes before having to stop and rest for about fifteen minutes and needing a cane to walk all the time. He also claimed being able to pay attention for five minutes, not being able to finish what he started, or follow written or oral instructions because he could not concentrate and was forgetful. He could deal with authority figures. He could not handle routine changes. His medications made him dizzy, drowsy, gave him headaches, and caused his body to shake. Tr. 92-107, 247-254, 271-278.

The Disability Determination Program referred the case to Dr. Alberto Rodríguez Robles for a consultative psychiatric evaluation, performed on March 4, 2014. This record is also in Spanish with no English translation. The ALJ summarized Exh. 6F as follows. Martell was diagnosed with dysthymic disorder, with a GAF score of 60, consistent with moderate symptomatology. His prognosis was guarded. Martell could manage his funds. Martell stated to Dr. Rodríguez that he did not sleep well and had crying spells. His wife helped him with his medication intake. He attended church, watched television at home, and talked with family but did not visit or receive visits from others. Being in groups made him nervous. During the exam, Martell appeared depressed and anxious. He was cooperative, maintained good eye contact, had adequate psychomotor activity, and his affect was appropriate. Martell's thoughts were logical, coherent, and relevant. His immediate and recent memory were adequate. He could adequately retain and

recall immediate information. His long-term memory was intact. Martell's judgment and insight were adequate. His social interaction with Dr. Rodríguez during the interview was adequate. Tr. 35, 385-390.

Dr. Jesús Soto, State agency medical consultant, reviewed the evidence on record and assessed on March 12, 2014 that the evidence indicated that Martell had a non-severe major depressive disorder. Tr. 117.

The case was referred to Dr. Karen Stewart Sotomayor for a consultative internal medicine evaluation, performed on April 7, 2014. Tr. 391-400. Dr. Stewart noted that Martell had an adequate gait without needing assistance or the use of walls for support. Tr. 33, 392, 396. Martell had shoulder and lumbar spasms, marked decreased right shoulder range of motion, tenderness to palpation, and ankle stiffness. He had a small superficial right heel ulcer of less than one centimeter with keratosis. Martell also had decreased bilateral posterior tibial pulses, bilateral +1 pitting edema, and decreased right leg and bilateral foot pinprick. Motor strength was normal in all extremities. Tr. 33, 392. Hand function was normal, and Martell was able to grip, grasp, pinch, finger tap, oppose fingers, button his shirt, pick up a coin, and write with both hands. Tr. 398. Dr. Stewart diagnosed diabetes mellitus Type II, high blood pressure, foot ulcer, right shoulder tendinopathy, status post arthroscopy, cervical/lumbar myositis, peripheral vascular disease, and some signs of radiculopathy and/pr neuropathy. Dr. Stewart assessed that those conditions limited Martell's ability to perform sustained standing, sitting, bending, stepping, kneeling, pushing, lifting, carrying and rising. Tr. 393. Dr. Stewart also noted Martell's depressed mood but was alert and oriented and had adequate thought content and idea communication. Tr. 392.

A cervical spine x-ray dated April 8, 2014 revealed early cervical spondylosis and non-visualization of the C7. A lumbosacral spine x-ray revealed lumbar spondylosis and discogenic disease. Tr. 401.

Dr. Rafael Queipo, State agency medical consultant, reviewed the physical evidence in the record and assessed on May 30, 2014 that Martell could occasionally[5] lift and/or carry, including upward pulling, twenty-five pounds and twenty pounds frequently.[6] He could stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday, and sit with normal breaks for about six hours in an eight-hour workday. Martell could push and/or pull unlimitedly,

---

[5] "[O]ccasionally is cumulatively 1/3 or less of an 8 hour day)". Tr. 119.
[6] "[F]requently is cumulatively more than 1/3 up to 2/3 of an 8 hour day)". Tr. 119.

including operating hand and foot controls. He could frequently climb ramps or stairs, stoop (bend in the waist), kneel, and crouch (bend at the knees). He could occasionally climb ladders, ropes or scaffolds, and crawl. He had no manipulative limitations (handling, fingering, and feeling), except that his ability to reach overhead to the right was limited. Martell had no visual, communicative, or environmental limitations. Tr. 119-120.

A consultative non-invasive arterial study of Martell's lower extremities, performed on July 1, 2014, revealed no stenosis in the major leg arteries and no flow reduction to the ankles. Tr. 402-403.

The claim was initially denied on July 3, 2014, with a finding that Martell retained the RFC to perform light work and that as per the record evidence, Martell's conditions caused limitations that affected his ability to perform some work duties but that he could perform other jobs and was therefore not disabled. Tr. 87, 109, 116, 121, 138.

Martell requested reconsideration (Tr. 142), claiming that since July 2014 his depression had worsened. Tr. 125, 260.

State agency non-examining physician Dr. Cindy Ramírez Pagán found on October 23, 2014 that the evidence in file did not sustain any finding of worsening of Martell's physical conditions. Dr. Ramírez affirmed the initial physical RFC finding as written. Dr. Luis Rodríguez also found no new evidence that showed worsening of Martell's mental conditions, and affirmed the initial non-severe psychiatric review finding. Tr. 129-134.

On October 27, 2014, the initial determination of not disabled was affirmed and the claim was denied upon reconsideration. Tr. 90, 123, 144. Martell claimed again that his conditions continue to worsen without improvement. Tr. 279.

At Martell's request (Tr. 147), a hearing before ALJ Pedro Tejada Rivera was held on February 9, 2017. Tr. 48-86, 171. Martell and Vocational Expert ("VE") Ariel Cintrón testified.

Martell testified that he was forty-nine years old, graduated high school, and was not fluent in English.[7] He worked painting and putting together office spaces (Tr. 77-78) and stopped working because of back and right shoulder pain and depression. He had left and right shoulder surgery, followed by therapy. Tr. 61. His right shoulder mobility was limited (rotating, lifting, reaching) and he didn't feel pain as long as "I don't use too much effort in my arm" (Tr. 62), such as by

---

[7] The ALJ asked: "Are you fluent in English, reading it, writing it, speaking it?" Martell answered: "No." Tr. 54.

moving or lifting something heavy or when using the lawnmower. He had not felt much improvement in his left shoulder and "the pain I have is unbearable." Tr. 65. He could slowly move his left shoulder without injuring it. He could raise his right hand to reach something from an upper cabinet but not with his left hand. Tr. 75. He could lift about five to eight pounds, such as when taking out the trash. Tr. 76. Martell also felt strong back pain from the neck down and was given injections and anti-inflammatory and pain medications. Tr. 65-66.

Martell also had knee surgery in July 2015 and frequently used a cane for walking. He felt pain in the inner part of the knee after continuously walking for more than half an hour. Tr. 61-65. The ALJ asked if the cane was recommended by the surgeon, and Martell answered "No. I simply use it because sometimes when I'm walking, my knee gives out and I can fall." Tr. 63.

Martell further testified that he took daily medications which made him dizzy so he stopped driving. Tr. 66-67. His knee and shoulder pain limited him at home. He would injure his back if he got up from bed too quickly. He couldn't soap up his back because his back didn't fully rotate. He couldn't tie his shoelaces. He couldn't sit or stand for too long. He could sit for twenty minutes before his back started swelling. He could walk for half-an-hour.  He could take the trash out but could not mop or sweep because those movements hurt his back. Tr. 69-72. Martell controlled his diabetes with injections and medications. He would sometimes get ulcers in his feet and heels, and he had a periferovascular problem in his lower extremities, which made his legs swell. Tr. 73-74.

Martell also testified that he suffered from and was treated for severe depression with medication and therapy, and "sometimes I get new episodes and what I have felt is improvement, but not actually getting cured." Tr. 67. He lived with his wife and daughters, but people and noises made him anxious and moody, and he felt better when alone. Tr. 68, 72.

The VE testified that Martell's prior work was in building maintenance repair, classified as a job with medium physical exertion and skilled or semi-skilled with a Specific Vocational Preparation ("SVP") rating of seven. Tr. 81-82. The first hypothetical question posed by the ALJ to the VE was if a person with Martell's age, educational and vocational profile, and with the following RFC for light unskilled work could work. The person could lift, carry, push and pull twenty pounds occasionally and ten pounds frequently; occasionally lift overhead; stand and walk for six hours total in an eight-hour workday; occasionally climb ramps and stairs, balance, bend, stoop and kneeling; could not climb ladders, ropes or scaffolds, or crawl; could not work without protective barriers, moving machinery or unprotected heights. Such a person could also do simple,

repetitive, routine tasks that could be learned in thirty days or less; understand, remember and carry out simple instructions; and interact occasionally with coworkers and frequently with supervisors but could not be exposed to or interact with large groups or crowds or directly service public. The VE answered that such a person could not perform Martell's past work, but that there were jobs in the national and regional economy existed that he could perform (light physical exertion with an SVP of two, unskilled, routine, repetitive), such as surgical instrument inspector, inspector and hand packager of plastic products, and plastic hospital products assembler. Tr. 81-83.

For the second hypothetical, the ALJ asked the VE's opinion as to a reduced sedentary level, that is, if a person with the following RFC could work: lift, carry, push and pull ten pounds occasionally and five pounds frequently; stand and walk for less than two hours total in an eight-hour workday; sit for less than four hours total in an eight-hour workday; occasionally climb ramps and stairs, balance, and stoop; could not climb ladders, ropes or scaffolds; could not kneel, crouch or crawl; limited reaching in all directions; and no work that required exposure to moving mechanical parts or unprotected heights. This person was also limited to occasional interaction with coworkers and supervisors and could not do work that required a fast pace or high production level such as working in an assembly line. The VE answered that such a person could not perform past work or sedentary work on a sustained basis as defined by the Dictionary of Occupational Titles ("DOT") and in his professional experience. Tr. 83-85.

On May 3, 2017, the ALJ found that Martell was not disabled under sections 216(i) and 223(d) of the Act, from October 2, 2013 to the date of the decision. Tr. 20-43. The ALJ sequentially found that Martell:

(1) had not engaged in substantial gainful activity since his alleged onset date of November 17, 2012 through his date last insured (Tr. 28);

(2) had severe impairments that, in combination, interfered with Martell's ability to perform basic work activities: hypertension, diabetes mellitus, degenerative changes in the spine, status post-surgery to both shoulders, status post-right knee arthroscopy, peripheral vascular disease, obesity, diabetic neuropathy, and depression and anxiety (Tr. 28);

(3) did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526) (Tr. 28);

(4) retained the RFC to perform light work as defined in 20 CFR 404.1567(b). Martell could lift/carry, push/pull up to twenty pounds occasionally and ten pounds frequently; and sit for about six hours and stand/walk for six out of eight working hours, except that he was precluded from crawling and climbing ladders, ropes, and scaffolds, and was limited to occasional balancing, stooping, kneeling, climbing ramps and stairs, and reaching overhead. He should not work near unprotected moving machinery or be exposed to unprotected heights. Martell was also limited to performing simple, routine, repetitive tasks and instructions or jobs that could be learned in thirty days or less; with no interaction with crowds or working directly with the public, occasional contact with coworkers and frequent contact with supervisors. (Tr. 31); and was therefore unable to perform past relevant work (Tr. 36); and

(5)  as per his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Martell could perform (such as surgical instrument inspector (DOT #712.684-050), plastic hospital product assembler (DOT #712.687-010), and inspector and hand packager of plastic products (DOT #559.687-074)). Tr. 37.

For Martell's physical conditions, the ALJ considered Listing 1.02 (major dysfunction of a joint) and Listing 1.04 (disorders of the spine). For Martell's mental impairments, Listings 12.04 and 12.06 were considered. Tr. 29. The ALJ found that the treatment records from Dr. Cruz and Dr. Machín did not support the alleged degree of pain or limitations. Tr. 33. The ALJ gave significant weight to consultative examiner Dr. Rodríguez's psychological evaluation because it supported no more than a moderate level of impairment. Tr. 35. The ALJ gave some weight to Dr. Stewart's consultative physical assessment, finding that Martell was likely limited from the activities mentioned by Dr. Stewart, and that Dr. Stewart's finding revealed limited range of motion in the right shoulder and supported that Martell had an adequate gait and did not require an assistive device. The ALJ stated accommodating these limitations for limited range of motion by limiting Martell's RFC to a light level of exertion and no more than occasional reaching overhead. Tr. 33-34.  The ALJ gave great weight to the State agency non-examining consultants' opinion that Martell was not disabled but gave partial weight to the physical RFC assessment because the ALJ found that Martell was more limited and the consultants didn't have evidence submitted after their review of the record. Tr. 35.

As to Martell's claim that he was unable to communicate in English, the ALJ cited 20 C.F.R. 415.1454(b)(1) in finding that "this was not consistent with his education or professional experience … An individual is illiterate when he lacks the ability to read or write a simple message such as instructions or an inventory list." The ALJ noted that Martell testified that he finished "high school" and worked a finger and pallet jack in English. Tr. 36.

The Appeals Council denied Martell's request for review on December 20, 2018, finding no reason to review the ALJ's decision and rendering the ALJ's decision the final decision of the Commissioner. Tr. 1-8, 221. The present complaint followed. Docket No. 1.

## DISCUSSION

This court must determine whether there is substantial evidence to support the ALJ's determination at step five in the sequential evaluation process that based on Martell's age, education, work experience, and RFC, there was work in the national economy that he could perform, thus rendering him not disabled within the meaning of the Act. Martell argues that (1) the ALJ disregarded Martell's claim that he lacked knowledge of the English language, and (2) that the ALJ's RFC and non-disability findings were not based on the record as a whole. Martell requests that he be found disabled and granted disability benefits, or that the case be remanded to the Commissioner for reconsideration of the evidence. *Id.* at 4. The Commissioner asked for the decision to be affirmed and the complaint dismissed. Docket No. 13 at 2.

First addressing Martell's claim that he is unable to communicate in English, Martell argues that the ALJ erred in not considering 20 CFR 404.1454(b)(5) when finding that Martell could perform the jobs of surgical instrument inspector, plastic hospital product assembler, and inspector and hand packager, which require some English knowledge as per their DOT descriptions. 20 CFR 404.1454(b)(5) states that "[b]ecause English is the dominant language of the country, it may be difficult for someone who doesn't speak and understand English to do a job, regardless of the amount of education the person may have in another language. Therefore, we consider a person's ability to communicate in English when we evaluate what work, if any, he or she can do. It generally doesn't matter what other language a person may be fluent in." The ALJ cited 20 CFR 415.1454(b)(1) in finding that Martell's claim that he did not communicate in English was not consistent with his education or professional experience. Tr. 36. Martell further argues that the ALJ disregarded that those words that Martell said in English during his testimony in the Spanish

language are common anglicisms used in Puerto Rico or common names used in the equipment industry. Docket No. 16 at 13-15.

The Commissioner argued that even if the ALJ erred in this conclusion, such an error would be harmless because in *Arce Crespo v. Secretary*, 831 F.2d 1 (1st Cir. 1987), the First Circuit took judicial notice that in Puerto Rico, the ability to communicate in Spanish, not in English, is what is vocationally relevant. The Commissioner also points to SSR 20-01p and argues that Martell's argument would be moot on remand because SSR 20-01p removes the consideration of English illiteracy from the disability evaluation process and instead considers if an individual cannot read or write in any language, *Id.* at 9. SSR 20-01p was not in effect at the time of the ALJ's decision. Docket No. 20 at 8.

Both in *Arce* and in this case, the VE testified that there were jobs in Puerto Rico found in large numbers that Martell could perform and the ALJ used the grid as a framework for considering the vocational testimony. *See* Tr. 36-37. The court in *Arce* reasoned that "the ALJ was justified in treating claimant's fluency in Spanish as tantamount to fluency in English." *Arce*, 831 F.2d at 6-7. In *Figueroa-Rodriguez v. Sec'y of Health & Human Servs.*, 845 F.2d 370, 372 (1st Cir. 1988), the First Circuit noted that *Arce* "took judicial notice 'that for the most part it is the ability to communicate in Spanish, not in English, that is vocationally important in Puerto Rico.' In that case, however, a vocational expert had testified to the existence of jobs in the Puerto Rico economy that claimant could perform. The Secretary had credited that testimony and found claimant could perform the enumerated jobs. On that basis alone, the Secretary's decision denying benefits was sustainable." 845 F.2d at 372. The court in *Figueroa* went further to state that "[w]e expressly declined, however, to determine whether, had there *not* been vocational testimony and had the Secretary relied on the grid alone for a dispositive finding of no disability, the Secretary could simply have substituted Spanish for English because claimant resided in Puerto Rico." *Id.*

That being the case, I agree that any error by the ALJ regarding language would be harmless error in this case. "[A]n ALJ's error is harmless where it is 'inconsequential to the ultimate nondisability determination.' "*Molina v. Astrue,* 674 F.3d 1104, 1115 (9th Cir. 2012) (citations omitted). Remanding this case for further elaboration of Martell's language skills would serve no additional purpose. *See United States* v. *Scott*, 270 F.3d 30, 46 (1st Cir. 2001) ("Even if we find error, we will not reverse if the error was harmless.").

Martell v. Commissioner of Social Security, Civil No. 19-1545 (BJM)                                    15

Martell's next argument is that the ALJ erred in determining that Martell had an RFC for light work, when the record shows that he had an RFC to perform sedentary work. Martell argues that had the ALJ found that his RFC was limited to sedentary work, then a finding of disabled would have been entered in accordance with Medical-Vocational Guidelines ("the Grid") 201.00(h)(1), which states that "a finding of 'disabled' is warranted for individuals age 45-49 who: (1) Are restricted to sedentary work." Docket No. 16 at 16-19. However, the ALJ used the Grid as a framework for considering the VE's testimony, which is done when the ALJ finds additional limitations that erode the occupational base. Tr. 37; *See* SSRs 83-11, 83-12, 83-14, 85-15. While, in Martell's opinion, the evidence shows that he was limited to sedentary work, the RFC determination is reserved to the Commissioner, and I will review here if there is substantial evidence to support that determination.

The ALJ is required to express a claimant's impairments in terms of work-related functions or mental activities, and a VE's testimony is relevant to the inquiry insofar as the hypothetical questions posed by the ALJ to the VE accurately reflect the claimant's functional work capacity. *Arocho v. Sec'y of Health and Human Services*, 670 F.2d 374, 375 (1st Cir. 1982).  In other words, a VE's testimony must be predicated on a supportable RFC assessment. *See* 20 C.F.R. § 404.1520(g)(1). An RFC assessment is "ultimately an administrative determination reserved to the Commissioner." *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (*citing* 20 C.F.R. §§ 416.927(e)(2), 416.946). But because "a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Id.*  Also, when determining which work-related limitations to include in the hypothetical question, the ALJ must: (1) weigh the credibility of a claimant's subjective complaints, and (2) determine what weight to assign the medical opinions and assessment of record.  *See* 20 C.F.R. §§ 404.1527, 404.1529. A claimant is responsible for providing the evidence of an impairment and its severity; the ALJ is responsible for resolving any evidentiary conflicts and determining the claimant's RFC. 20 C.F.R. § 404.1545(a)(3); *see also Tremblay v. Sec'y of Health & Human Servs.*, 676 F.2d 11, 12 (1st Cir. 1982) (citing *Richardson v. Perales*, 402 U.S. 389 (1971)).

The record shows multiple evaluations, x-rays and scans, and longitudinal treatment for obesity, diabetes and hypertension since 2010, progressive worsening of low back due to degenerative changes in the spine, and shoulder and knee pain that eventually led to surgeries and

physical therapy between 2014 and 2016. The ALJ recognized these conditions as severe impairments that, in combination, interfered with Martell's ability to perform basic work activities.

Physical therapy notes dated 2014 after Martell's right shoulder surgery indicate improvement of articular mobility and function, with low pain levels. Progress notes from Dr. Machín's record, dated between 2014 and 2015, indicate that Martell was able to walk, had no complaints of pain, and no edema in his extremities. Notes from after Martell's 2015 right knee surgery indicate that Martell needed to use a cane right after his surgery but that he was doing well with minimal pain and good range of motion, and that he went to physical therapy to increase range of motion and muscle strength. Martell also received physical therapy after his 2016 left shoulder surgery, and the 2017 notes indicate that his pain had diminished some and that he walked safely without assistive equipment. I note that the record appears to show that Martell was able to control his diabetes and hypertension through medications, and that he was continuously being recommended diet and exercise.

As to the consultative evidence, Dr. Stewart performed a consultative evaluation in 2014, finding that Martell had shoulder and lumbar spasms, decreased right shoulder range of motion and ankle stiffness, but had adequate gait, normal motor strength in his extremities, and normal hand function. Dr. Sotomayor assessed that Martell could perform sustained standing, sitting, bending, stepping, kneeling, pushing, lifting, carrying, and rising. Dr. Queipo assessed that from the evidence available up to 2014, Martell could occasionally lift and/or carry, including upward pulling, twenty-five pounds and twenty pounds frequently. He could stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday, and sit with normal breaks for about six hours in an eight-hour workday. Martell could push and/or pull unlimitedly, including operating hand and foot controls. He could frequently climb ramps or stairs, stoop (bend in the waist), kneel, and crouch (bend at the knees). He could occasionally climb ladders, ropes or scaffolds, and crawl. He had no manipulative limitations (handling, fingering, and feeling), except that his ability to reach overhead to the right was limited. Martell had no visual, communicative, or environmental limitations.

Martell testified that his right shoulder mobility was limited, specially when rotating, lifting, and reaching, and that he did not feel pain as long as he didn't "use too much effort" such as by doing activities like lifting something heavy or using a lawnmower. Tr. 62, 65. His left shoulder mobility was more limited, but the hearing before the ALJ was held 2017, shortly after

his 2016 left shoulder surgery. He could lift five to eight pounds. He couldn't sit or stand for too long and could walk for half-an-hour. Martell liked using a cane for support when walking but acknowledged that its use was not by prescription or surgeon recommendation.

The ALJ recognized that Martell had more limitations than assessed by the consultative and non-examining consultants in 2014 and accommodated these additional limitations in the RFC finding for light work. The ALJ reduced the amount of weight Martell could lift/carry, push/pull to twenty pounds occasionally and ten pounds frequently, and was precluded from crawling and climbing ladders, ropes, and scaffolds, and was limited to occasional balancing, stooping, kneeling, climbing ramps and stairs, and reaching overhead. And he should not work near unprotected moving machinery or be exposed to unprotected heights.

Also, a person that can do light work can also do sedentary work, which requires lifting no more than ten pounds at a time, sitting for at least six hours out of an eight-hour work day, occasional walking and standing for no more than about two hours a day, and good use of the hands and fingers for repetitive hand-finger actions. 20 C.F.R. § 404.1567(a) & (b); SSR 83-10. Sedentary work does not require that a person be seated for six unbroken hours without shifting position during an 8-hour workday. *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004). I note that the VE's second hypothetical question, to which the VE answered that such a person could not work, refers to less than sedentary activities, specifically sitting for less than four hours total in an eight-hour workday. Martell makes reference to "[w[hen the VE was presented with *hypothetical #2,* and work output was reduced to *sedentary level*." Docket No. 16 at 18. However, the ALJ's question was in reference to a less than sedentary capacity, not that the claimant's ability to work was reduced from light work to sedentary work. The ALJ stated "I would like to consider a second hypothetical question in this occasion, I would like to work at a reduced sedentary level." Tr. 83. The ALJ asked the VE if a person that could perform work to a reduced sedentary level could work, to which the VE answered that such a person could not perform past work or sedentary work on a sustained basis as defined by the Dictionary of Occupational Titles ("DOT") and in his professional experience. Tr. 83-85. The record also shows that Martell had normal hand function, and Dr. Stewart found that Martell was able to grip, grasp, pinch, finger tap, oppose fingers, button his shirt, pick up a coin, and write with both hands.

The ALJ also acknowledged Martell's depression and anxiety as severe impairments although the medical consultants did not consider his mental conditions severe, and limited Martell

to performing simple, routine, repetitive tasks and instructions or jobs that could be learned in thirty days or less; with no interaction with crowds or working directly with the public, occasional contact with coworkers and frequent contact with supervisors. APS treatment records and consultative psychiatrist Dr. Rodríguez placed his GAF score at 60. A GAF score between 51 and 60 indicates 'moderate symptoms' or 'moderate difficulty in social occupational, or school functioning.'"   *Hernandez v. Comm'r of Soc. Sec.*, 989 F. Supp. 2d 202, 206 f.n. 1 (D.P.R. 2013)(*quoting* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. text rev. 2000) (DSM–IV–TR)).[8]

As to Martell's arguments that the ALJ interpreted raw data, arbitrarily chose which medical evidence and opinions to give weight to, giving little weight to the treating physicians' evidence and opinions, and failed to seek additional consultative opinions (Docket No. 1 at 3; Docket No. 16 at 3, 22), such arguments are without merit as well. The ALJ is a lay person who is generally unqualified to interpret "raw, technical medical data." *Berrios v. Sec'y of Health & Human Servs.*, 796 F.2d 574, 576 (1st Cir. 1986). The ALJ may not substitute his "own impression of an individual's health for uncontroverted medical opinion." In other words, an ALJ needs a medical expert to translate medical evidence into functional terms.  *Vega-Valentin v. Astrue*, 725 F. Supp. 264, 271 (D.P.R. 2010).   However, an ALJ may render a common-sense judgment regarding an individual's capacities, so long as he "does not overstep the bounds of a lay person's competence and render a medical judgment." *Gordils v. Sec'y of Health & Human Servs.*, 921 F.2d 327, 329 (1st Cir. 1990). While it is true that the physical and mental consultative examination reports and the State agency RFC assessments pre-date two of Martell's three surgeries and were offered around three years before the hearing was held, it is evident that the ALJ acknowledged

---

[8] The SSA's administrative memorandum AM-13066 advises adjudicators that a GAF score should not be dispositive of impairment severity. GAF scores were discontinued in the current Diagnostic and Statistics Manual of Mental Disorders (5th edition) ("DSM-V"), which was published in 2013, but were still part of the DSM-IV-TR at the time of Martell's treatment. Because the GAF scores are no longer used in the DSM-V, the SSA directed adjudicators through the AM-13066 to continue receiving and considering GAF scores as they would with other opinion evidence, but that the score must have supporting evidence to be given significant weight. *Valentín-Incle v. Comm'r of Soc. Sec.*, Civ. No. 15-2137 (MEL), 2018 U.S. Dist. LEXIS 215060, 2018 WL 6721340, at *10 n.2 (D.P.R. Dec. 19, 2018) (citations omitted).

I note that the ALJ used the GAF scores in the record, in conjunction with other evidence, as part of the RFC discussion and non-disability findings. The ALJ does not exclusively rely on the GAF scores to assess the severity of Martell's mental condition, but makes reference to them in determining his functional abilities and limitations.

this fact and, along with other evidence in the record, made a more restrictive RFC determination than that offered by the medical consultants, as thoroughly detailed in the ALJ's decision.

As a final matter, Martell raises two skeletal arguments that I am deeming waived. Martell argues that the GAF score of 60 considered by the ALJ did not take into account physical or environmental impairments and that the ALJ did not properly consider the effects of his obesity, such as that it exacerbated his knee problems. Martell did not offer arguments or direct this court to evidence that would persuade us so. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.").

Ultimately, it is the Commissioner's responsibility to determine issues of credibility, draw inferences from the record evidence, and resolve conflicts in the evidence (*see Ortiz*, 955 F.2d at 769 (citing *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981); *Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 141 (1st Cir. 1987)). After thoroughly and carefully reviewing the record, I find that there is substantial evidence to support the ALJ's RFC finding in this case.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **AFFIRMED**.

This report and recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within fourteen days** of its receipt. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 23rd day of September, 2021.

*s/ Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge